UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

|  |  |  |
|---|---|---|
| JONATHAN C. RICHARDSON a/k/a AUTUMN E. CORDELLIONE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:23-cv-00212-RLY-CSW |
| TONY GRAY Chaplain, | ) ) ) | |
| Defendant. | ) ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Autumn Cordellioné, whose legal name is Jonathan Richardson, is a transgender inmate who was at all relevant times housed at Branchville Correctional Facility ("Branchville"). She filed this civil action alleging that Tony Gray, the chaplain at Branchville, refused to permit her to wear a hijab due to discriminatory animus against transgender inmates.

Chaplain Gray has moved for summary judgment. Because the court concludes that he is entitled to qualified immunity, the motion for summary judgment, dkt. [75], is **granted**.

**I.**
**Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A

1

court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Chaplain Gray has moved for summary judgment under Rule 56(a), the court views and recites the evidence in the light most favorable to Ms. Cordellioné, the non-moving party, and draws all reasonable inferences in her favor. *Khungar*, 985 F.3d at 572–73.

### A.  The Parties and IDOC's Religious Services Policy

Plaintiff Autumn Cordellioné has been an Indiana Department of Correction ("IDOC") inmate since 2002. Dkt. 75-1 at 14 (Cordellioné Dep.). She was diagnosed with gender dysphoria in 2020, *id.* at 21, and identifies as a transgender woman, dkt. 89-1 at 6 (Cordellioné Decl.). Defendant Tony Gray has been the chaplain at Branchville since May 2014. Dkt. 75-2 at 1 (Gray Decl.).

IDOC Policy 01-03-101 governs religious policies. Dkt. 75-3. The policy defers to each facility to determine whether religious items or symbols should be restricted to certain areas,

consistent with each facility's particular penological, safety, and security risks. *Id.* at 30. Under Branchville's facility directive, the only religious headgear that may be worn throughout the facility are yarmulkes and kufis. Dkt. 75-4 at 2. Other ceremonial headwear may only be worn in the inmate's immediate bed area or in a religious programming area. *Id.* at 2-3.

David Liebel, IDOC's Director of Religious Services, attested that uniformity among inmates' dress is essential to maintaining safe and secure prison operations. Dkt. 75-5 at 1-2. Mr. Liebel attested that "slight variations" in inmates' dress can pose substantial security risks, and that, in his opinion, permitting Ms. Cordellioné to wear a hijab in common areas in Branchville could place her safety at risk due to her appearing more feminine. *Id.* at 3, 6-7.

### B. Ms. Cordellioné's Religious Background

During intake upon her incarceration in 2002, Ms. Cordellioné told prison staff that she was "an eclectic follower of the Theosophical Society in America" who "studied mostly in Muslim/Islam as well as some Christian and—well, Catholic beliefs, and also in some pagan and Wicca beliefs." Dkt. 75-1 at 14-15. She thought her religious history should be "Other," but prison staff recorded her in their computer system as being pagan. *Id.* at 15. In 2013, there was a system change in IDOC wherein they changed any inmate listed as pagan to Wicca. *Id.* at 17.

Though she studies all religions, Ms. Cordellioné most closely identifies with being Sunni Muslim. *Id.* at 18-19. Ms. Cordellioné did not change her religious preference in the IDOC system to Muslim until March 7, 2024. *Id.* at 19. She said she did not openly declare her Muslim faith before that because it was not safe for her to do so around other Muslims, and she did not want to be "restricted on [her] studies, on [her] beliefs." *Id.* at 20-21.

Ms. Cordellioné purchased a hijab, a shawl worn over the head by some Muslim woman, in January 2021 when she was housed at Correctional Industrial Facility. *Id.* at 21-22. Ms.

Cordellioné understands that Muslim women wear hijabs for modesty, and that is why she wears it. *Id.* at 23, 25. Muslim men wear a cap called a kufi. *Id.* at 26.

Ms. Cordellioné's transgender identity makes it difficult for her to practice her religion. *Id.* On one hand, she testified that she was assaulted when she began wearing a hijab because many Muslims do not accept people who identify with the LGBTQ community. *Id.* at 27. On the other hand, when she wasn't permitted to wear a hijab, she "was harmed even more" for not covering herself as she should. *Id.* Ms. Cordellioné adopts some, but not all, of the teachings of Islam. *Id.* at 28.

Ms. Cordellioné has been permitted to wear her hijab in common areas at Wabash Valley Correctional Facility, Correctional Industrial Facility, Westville Correctional Facility, and New Castle Correctional Facility. Dkt. 89-1 at 8. She acknowledges that she is the only transgender inmate in a male IDOC facility that wears a hijab. Dkt. 89 at 8 (Verified Response in Opposition to Motion for Summary Judgment).

### C.  Interactions with Chaplain Gray

In May 2023, Officer Goffinet sent an email to Chaplain Gray with the subject heading, "New Transgender?" Dkt. 75-16. In the email, he said, "What's up with the new transgender headgear? If it's for Muslim reasons, I think it should be a traditional Kufi." *Id.*

In response to that email, Chaplain Gray met with Ms. Cordellioné in an office. Dkt. 75-1 at 38. He told her that she could not wear her hijab in common areas. *Id.* at 38. She told him that she is a Muslim female and wore it for modesty reasons, and that she had been permitted to wear it at other IDOC facilities.[1] *Id.* Chaplain Gray responded that she was in a male facility and had to

---

[1] Chaplain Gray attested that Ms. Cordellioné did not disclose that she was Muslim during this meeting, and that he relied on her being listed as a Wiccan in IDOC's system. Dkt. 75-2 at 3. But reciting the evidence in Ms. Cordellioné's favor, the court assumes for summary judgment that she disclosed that she was a practicing Muslim during this encounter.

"abide by male rules." *Id.* at 38-39. Chaplain Gray told Ms. Cordellioné that she could wear the hijab at any religious service she attended or in her personal living area. Dkt. 75-2 at 3. Ms. Cordellioné told Chaplain Gray that she would be assaulted by other Muslims for not wearing a hijab. Dkt. 89-1 at 7. Ms. Cordellioné told him that she observed male Muslims wear their kufis throughout the facility, and Chaplain Gray said he would speak to the captain about her request. Dkt. 75-1 at 39.

Ms. Cordellioné and Chaplain Gray then went into either a lieutenant or major's office to discuss the matter, where Ms. Cordellioné again pointed out that Muslim men could wear kufis throughout the facility. *Id.* The officer said he would defer to Chaplain Gray's decision to not allow her to wear her hijab. *Id.*

Ms. Cordellioné filed a grievance asking to be permitted to wear her hijab at all times. Dkt. 1-1 at 4. The grievance specialist denied it due to Chaplain Gray's response that Ms. Cordellioné had been "assigned to a male facility known as Branchville Correctional. Branchville Correctional follows the rules for male headwear for Religious Purposes as stated in IDOC Policy 01-03-101." *Id.* at 2.

As it related to her hijab, Ms. Cordellioné spoke with Chaplain Gray on one more occasion to see if he had spoken with someone in IDOC's Central Office about allowing her to wear her hijab in communal spaces. Dkt. 75-1 at 56. According to Ms. Cordellioné, Chaplain Gray responded that she "was in a male facility, and it doesn't matter [that she is] transgender. As long as [she] got a dick between [her] legs, [she's] a male" and would "abide by male facility rules." *Id.*; *see also* dkt. 75-9 at 45 (Inmate Marco Martinez testifying similarly about the encounter).[2]

---

[2] Chaplain Gray denies that he made these statements. Dkt. 75-2 at 6.

Chaplain Gray did not confiscate Ms. Cordellioné's hijab while she was at Branchville, nor was he aware of any other staff member confiscating it. Dkt. 75-2 at 4.

On March 7, 2024, Ms. Cordellioné submitted a request to Chaplain Gray to update her religious preference to Muslim. Dkt. 75-2 at 4. He approved the request that day.[3] *Id.*

**D.  Threats by Other Inmates and February 2024 Assault by Other Inmate**

About a month after Chaplain Gray told Ms. Cordellioné that she could not wear her hijab in common areas, a group of three Muslim inmates approached her in the shower and threatened to sexually assault and beat her for not wearing the hijab. Dkt. 75-1 at 51-52. Inmate Martinez intervened and stopped the inmates before they could assault her. *Id.* at 52.

On February 9, 2024, another inmate stabbed Ms. Cordellioné in a bathroom at Branchville. Dkt. 75-10 (Conduct Records). An investigator with the Office of Investigations and Intelligence investigated the incident and concluded that the assault was at the order of a security threat group due to Ms. Cordellioné's affiliation with another inmate. Dkt. 75-8 at 1-2 (Gaynor Decl.). The investigator did not find any evidence that the assault was religiously motivated. *Id.* at 2. However, both Ms. Cordellioné and inmate Martinez testified that the inmate assaulted Ms. Cordellioné at least in part due to her stating she was Muslim but was not wearing a hijab. Dkt. 75-9 at 36-37 (Martinez Depo.); dkt. 75-1 at 50-51.

In March 2024, Ms. Cordellioné was transferred to a Protective Custody unit at New Castle both due to the stabbing and publicity about her crime that was broadcast on televisions at Branchville. Dkt. 86-2 at 2.

---

[3] Defendants include factual allegations about Ms. Cordellioné's efforts to participate in Ramadan meals in February 2024. Because Ms. Cordellioné only challenged her ability to wear her hijab in her complaint and because she does not discuss the Ramadan meals in her response brief, *see* dkt. 89, the court does not discuss her exclusion from Ramadan meals further.

### III.
### Discussion

Pursuant to its screening order, the court permitted Ms. Cordellioné to proceed with First Amendment free exercise, Fourteenth Amendment equal protection, and Eighth Amendment deliberate indifference claims against Chaplain Gray.[4] Dkt. 23 at 4.

Chaplain Gray argues that he is entitled to qualified immunity, or that he is entitled to summary judgment on the merits of Ms. Cordellioné's claims.

### A.  Qualified Immunity

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of

---

[4] The court also screened through a RLUIPA claim. However, Ms. Cordellioné is no longer housed in Branchville, and she is permitted to wear her hijab in her current facility. Thus, any claim under RLUIPA is now moot, and the court does not discuss it further. *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot.").

generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

The court may analyze the qualified immunity prongs in any order it chooses. *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal citation and quotation marks omitted) (emphasis in original). For the following reasons, the court concludes that Chaplain Gray is entitled to qualified immunity on each of Ms. Cordellioné's claims.

### B. First Amendment Free Exercise Claim

To succeed on her First Amendment free-exercise claim, Ms. Cordellioné must show that Chaplain Gray "personally and unjustifiably placed a substantial burden on [her] religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). "A substantial burden puts substantial pressure on an adherent to modify [her] behavior and to violate [her] beliefs." *Id.* (cleaned up).

"[A]n inmate is not entitled to follow every aspect of his religion; the prison may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious interests." *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005). Thus, even a substantial burden is permitted if the burden is "reasonably related to legitimate penological objectives." *Vinning-El v. Evans*, 657 F.3d 591, 592−93 (7th Cir. 2011) (citing *Turner v. Safley*, 482 U.S. 78, 89−91 (1987)).

The undisputed evidence reflects that Chaplain Gray denied Ms. Cordellioné's request to wear a hijab because that is a religious item worn by female Muslims, and Ms. Cordellioné was an inmate in a male facility. There is little doubt that this denial placed a substantial burden on Ms. Cordellioné's ability to express her modesty consistent with her religious beliefs. The court need not delve into the *Turner* factors to determine whether, on balance, there were penological reasons justifying this rule. That is because this novel issue has not been decided by a federal court before, and, thus, Chaplain Gray is entitled to qualified immunity.

There is no precedent that would have put Chaplain Gray on notice that denying a transgender inmate the right to wear a religious item consistent with her gender identity violated her right to exercise her religion. In *Beard v. Falkenrath*, 97 F.4th 1109 (8th Cir. 2024), a transgender inmate filed a lawsuit challenging officers' actions when she appeared for a meeting wearing pigtails and a homemade miniskirt, resulting in the officers using excessive force and stripping her of her clothing. As it related to her First Amendment freedom of expression claim, the court concluded that defendants were entitled to qualified immunity because "[n]o case establishes that an all-male prison must allow an inmate to wear [gender-identity-conforming clothing]." *Id.* at 1117. Similarly, the court has not found any case that would put Chaplain Gray on notice that he was violating Ms. Cordellioné's religious exercise rights by not permitting her to

wear a head covering traditionally worn by women. This is so even considering the crude and transphobic statements he is alleged to have made. *See Beard*, 97 F.4th at 1117 ("The guards may have been rude to [Plaintiff], and their statements humiliating, but the Constitution does not require prison officials to speak in a way an inmate prefers."). He is entitled to qualified immunity as to this claim.

### C.  Eighth Amendment Failure to Protect

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Ms. Cordellioné must show that (1) Chaplain Gray was aware of a substantial risk of serious injury to her, and (2) he acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An inmate "normally proves actual knowledge of impending harm by showing that [she] complained to prison officials about a specific threat to [her] safety." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (internal citations and quotation marks omitted). "Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 481.

*Farmer v. Brennan* involved an Eighth Amendment failure-to-protect claim brought by a transgender inmate, and in a concurrence, Justice Blackmun highlighted special risks faced by transgender inmates in male prisons. *Farmer*, 511 U.S. at 852-83 (J. Blackmun, concurring). But

the safety concerns faced by transgender inmates in general would not have put Chaplain Gray on notice that other Muslim inmates would target Ms. Cordellioné specifically for her failure to wear a hijab. Indeed, Ms. Cordellioné acknowledged that practicing her Muslim faith openly could expose her to risk because she did not adhere to many traditional teachings of Islam, including in the way she dressed. Dkt. 75-1 at 27 ("Being transgender or anything in the LGBTQ category and a Muslim, for many extremists, go against what they believe. And in prison, we have a high amount of extremist individuals."). Thus, where Ms. Cordellioné provided no specific details to Chaplain Gray about who might attack her for not wearing a hijab, Chaplain Gray cannot be held liable for failing to predict that her non-conformity to one aspect of Muslim dress would expose her to a substantial risk of harm. He is entitled to qualified immunity.

### D. Fourteenth Amendment Equal Protection

The Fourteenth Amendment forbids the State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV § 1. This clause has been described as "a Constitutional anti-discrimination rule." *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 614 (7th Cir. 2024) (collecting authority). The level of judicial review under the Equal Protection clause depends on which class is being treated differently. *K.C.*, 121 F.4th at 615. Judicial analysis begins by "identifying the particular 'differential treatment' or 'official action that closes a door or denies opportunity to' a person." *K.C.*, 121 F.4th at 615 (quoting *United States v. Virginia*, 518 U.S. 515, 532–33 (1996)).

IDOC's religious policy and Branchville's facility directives do not make gender classifications for religious headwear. Dkts. 75-3, 75-4. Rather, religious accommodations are determined at the facility-level in consultation with IDOC central office officials. Dkt. 75-3 at 30; dkt. 75-5 at 5. Thus, these policies "may incidentally burden transgender people without burdening

non-transgender people." *K.C.*, 121 F.4th at 620. Because there is no evidence that these policies were enacted as a "pretext designed to discriminate against transgender people[,]" rational basis review applies. *Id.*

The court is "highly deferential to the government" when applying rational basis review to equal protection claims: "If 'any reasonably conceivable state of facts …could provide a rational basis for the classification,' the challenged law is constitutional." *Id.* (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Religious Director Liebel's explanation that limiting Ms. Cordellioné to wearing her hijab in only private spaces to protect her safety is a rational reason for the limitation. *See Pell v. Procunier*, 417 U.S. 817, 827 (1974) (noting that in the prison context, "considerable attention [must] be devoted to the maintenance of security"). Because no case precedent would put Chaplain Gray on notice that this limitation violated Ms. Cordellioné's rights under the Equal Protection clause, he is entitled to qualified immunity on this claim.

**IV.**
**Conclusion**

Given the novel set of facts presented in this case, Chaplain Gray is entitled to qualified immunity as to all claims, and the motion for summary judgment, dkt. [75], is **granted**.

Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 9/03/2025

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distribution:

    JONATHAN C. RICHARDSON
    127630 E-11-24
    NEW CASTLE - CF
    NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
    1000 Van Nuys Road
    P.O. Box E
    NEW CASTLE, IN 47362

    All Electronically Registered Counsel